## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | S1 3:23-CR-00026 (KAD) |
| GLENN OZTEMEL, | : | |
| GARY OZTEMEL, and | : | |
| EDUARDO INENECCO | : | |

## GLENN OZTEMEL'S MEMORANDUM OF LAW
## <u>IN SUPPORT OF HIS SUBSTANTIVE MOTIONS</u>

Nelson A. Boxer
David Hoffman
Chanel Thomas
PETRILLO KLEIN & BOXER LLP
655 Third Avenue
New York, NY 10017
(212) 370-0338
nboxer@pkbllp.com

Paul McConnell
638 Prospect Avenue
Hartford, Connecticut 06105
(860) 266-1166
paul@mcconnellfamilylaw.com

October 16, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 4

   I.    Procedural History ....................................................................................................... 4

   II.   The S1. ......................................................................................................................... 5

   III.  The Search Warrants. ................................................................................................... 7

LEGAL STANDARDS ......................................................................................................... 8

   I.    Rule 12(b). ................................................................................................................... 8

   II.   Rule 7(f). ...................................................................................................................... 9

   III.  The Fourth Amendment. .............................................................................................. 9

ARGUMENT ..................................................................................................................... 10

   I.    The Court Should Dismiss Counts One through Seven of the S1 for Failure to Allege a Violation of the FCPA and the IML Statute—or a Conspiracy to Commit those Offenses. ..... 10

      A.   The Substantive Counts Are Unconnected to Bribe Payments to Berkowitz. ............ 10

        1.   Governing Law. ....................................................................................................... 11

        2.   The Commission Payments Underlying the Substantive Counts Postdate the Alleged Bribes to Berkowitz by Years. ................................................................................... 13

      B.   The Conspiracy Counts Are Barred by the Statute of Limitations. ........................... 15

        1.   MLAT Tolling Does Not Apply. ............................................................................... 16

        2.   The FCPA Conspiracy Count Is Untimely. ............................................................. 18

        3.   The IML Conspiracy Count Is Untimely. ................................................................ 22

      C.   Berkowitz Is Not a "Foreign Official" Because Petrobras Is Not an "Instrumentality" of Brazil. .................................................................................................................. 23

   II.   Even if the Court Does Not Dismiss, It Should Order a Bill of Particulars that Identifies the Bribes to Foreign Officials upon which the Charges Are Based. ....................................... 23

   III.  The Court Should Suppress Glenn Oztemel's Emails Because the Government Violated His Fourth Amendment Rights. ........................................................................................... 26

      A.   The Court Should Suppress the Evidence from the Searches of Glenn Oztemel's Yahoo and Apple Accounts, After a *Franks* Hearing. .................................................. 26

        1.   The Yahoo Search Warrant Affidavit Withheld Material Information in Bad Faith. 27

          a.   Material Omissions. ............................................................................................. 27

          b.   Necessary to Probable Cause. .............................................................................. 31

          c.   Recklessness. ....................................................................................................... 35

2.    The Apple Search Warrant Affidavit Withheld Material Information and Deceptively
Edited Email Evidence. ........................................................................ 35

B.    The Government's Search of Glenn Oztemel's Yahoo and Apple Accounts
"Flagrantly Disregarded" the Scope Allowed under the Warrants. ..................................... 37

CONCLUSION ...................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Franks v. Delaware,*
438 U.S. 154 (1978)................................................................................. 5

*Ganek v. Leibowitz,*
874 F.3d 73 (2d Cir. 2017)...................................................................... 15

*McColley v. Cnty. of Rensselaer,*
740 F.3d 817 (2d Cir. 2014).................................................................... 35

*Riley v. California,*
573 U.S. 373 (2014)................................................................................. 7

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber,*
327 F.3d 173 (2d Cir. 2003).................................................................... 17

*Toussie v. United States,*
397 U.S. 112 (1970)................................................................................. 20

*U.S. v. Mahaffy,*
446 F. Supp. 2d 115 (E.D.N.Y. 2006) ..................................................... 30

*United States v. Aleynikov,*
676 F.3d 71 (2d Cir. 2012)...................................................................... 13

*United States v. Ali,*
870 F. Supp. 2d 10 (D.D.C. 2012) ........................................................... 37

*United States v. Allen,*
788 F.3d 61 (2d Cir. 2015)...................................................................... 23

*United States v. Bankman-Fried,*
2023 WL 4194773 (S.D.N.Y. June 27, 2023) ......................................... 18

*United States v. Ben Zvi,*
242 F.3d 89 (2d Cir. 2001)...................................................................... 23

*United States v. Benjamin,*
2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022) ......................................... 13

*United States v. Bortnovsky*,
  820 F.2d 572 (2d Cir. 1987)................................................................. 14

*United States v. Bowen*,
  689 F. Supp. 2d 675 (S.D.N.Y. 2010)................................................. 37

*United States v. Burfoot*,
  899 F.3d 326 (4th Cir. 2018) .............................................................. 21

*United States v. Cacace*,
  796 F.3d 176 (2d Cir. 2015)................................................................. 42

*United States v. Carpenter*,
  2015 WL 9305638 (D. Conn. Dec. 21, 2015) ................................... 27

*United States v. Carson*,
  2011 WL 5101701 (C.D. Cal. May 18, 2011) ................................... 28

*United States v. D'Amelio*,
  683 F.3d 412 (2d Cir. 2012)................................................................. 15

*United States v. DeFilippo*,
  2023 WL 5000385 (D. Conn. Aug. 4, 2023) ..................................... 13

*United States v. Disla Ramos*,
  2022 WL 17830637 (S.D.N.Y. Dec. 21, 2022) ................................. 39

*United States v. Donagher*,
  520 F. Supp. 3d 1034 (N.D. Ill. 2021) .............................................. 20

*United States v. Duperval*,
  777 F.3d 1324 (11th Cir. 2015) .......................................................... 28

*United States v. Falso*,
  544 F.3d 110 (2d Cir. 2008)................................................................. 38

*United States v. Gagnon*,
  373 F.3d 230 (2d Cir. 2004)................................................................. 32

*United States v. Galpin*,
  720 F.3d 436 (2d Cir. 2013)................................................................. 39

*United States v. Ganais*,
  824 F.3d 199 (2d Cir. 2016)................................................................. 42

*United States v. Ganim*,

225 F. Supp. 2d 145 (D. Conn. 2002) ........................................................................ 29

*United States v. Garcia*,
2023 WL 4850553 (D. Conn. July 28, 2023) ........................................................ 39

*United States v. Gasperini*,
2017 WL 2399693 (E.D.N.Y. June 1, 2017) ......................................................... 14

*United States v. Gotti*,
457 F. Supp. 2d 411 (S.D.N.Y. 2006) ................................................................... 25

*United States v. Griffith*,
867 F.3d 1265 (D.C. Cir. 2017) ............................................................................ 39

*United States v. Grimm*,
738 F.3d 498 (2d Cir. 2013) ................................................................................... 24

*United States v. Hawit*,
2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ......................................................... 29

*United States v. Heicklen*,
858 F. Supp. 2d 256 (S.D.N.Y. 2012) ................................................................... 14

*United States v. Hitt*,
249 F.3d 1010 (D.C. Cir. 2001) ............................................................................ 24

*United States v. Ho*,
984 F.3d 1912d Cir. 2020) ..................................................................................... 17

*United States v. Hoskins*,
12 Crim. 238 (D. Conn. Apr. 15, 2015) ................................................................ 19

*United States v. Inniss*,
2022 WL 5061706 (2d Cir. Oct. 5, 2022) ............................................................. 17

*United States v. Kerik*,
615 F. Supp. 2d 256 (S.D.N.Y. 2009) ................................................................... 26

*United States v. Kozeny*,
493 F. Supp. 2d 693 (S.D.N.Y. 2007) ................................................................... 21

*United States v. Kozeny*,
638 F. Supp. 2d 348 (S.D.N.Y. 2009) ................................................................... 27

*United States v. Kozeny*,
667 F.3d 122 (2d Cir. 2011) ................................................................................... 16

v

*United States v. Kozeny,*
    No. 11-5390 (2d Cir. 2012) ................................................................ 16

*United States v. Lahey,*
    967 F. Supp. 2d 698 (S.D.N.Y. 2013) ................................................. 36

*United States v. Lauria,*
    70 F.4th 106 (2d Cir. 2023) ................................................................ 14

*United States v. Liu,*
    239 F.3d 138 (2d Cir. 2000) ............................................................... 42

*United States v. Marion,*
    404 U.S. 307 (1971) ........................................................................... 20

*United States v. Matias,*
    836 F.2d 744 (2d Cir. 1988) ............................................................... 42

*United States v. McGuinness,*
    764 F. Supp. 888 (S.D.N.Y. 1991) ..................................................... 29

*United States v. McKenzie,*
    13 F.4th 223 (2d Cir. 2021) ............................................................... 15

*United States v. Mennuti,*
    679 F.2d 1032 (2d Cir. 1982) ............................................................. 27

*United States v. Murgio,*
    209 F. Supp. 3d 698 (S.D.N.Y. 2016) ............................................... 29

*United States v. Nejad,*
    436 F. Supp. 3d 707 (S.D.N.Y. 2020) ............................................... 43

*United States v. Nerlinger,*
    862 F.2d 967 (2d Cir. 1988) ............................................................... 30

*United States v. Ng Lap Seng,*
    934 F.3d 110 (2d Cir. 2019) ................................................................. 6

*United States v. Pham,*
    2022 WL 993119 (S.D.N.Y. Apr. 1, 2022) ........................................ 23

*United States v. Pirro,*
    212 F.3d 86 (2d Cir. 2000) ................................................................. 13

*United States v. Poddle*,
  105 F.3d 813 (2d Cir. 1997)................................................................. 21

*United States v. Rajaratnam*,
  2010 WL 2788168 ................................................................................ 30

*United States v. Raymonda*,
  780 F.3d 105 (2d. Cir. 2015)............................................................... 38

*United States v. Reed*,
  409 F. App'x 471 (2d Cir. 2011) ........................................................ 37

*United States v. Rosenblatt*,
  554 F.2d 36 (2d Cir. 1977).................................................................. 24

*United States v. Rutherford*,
  71 F. Supp. 3d 386 (S.D.N.Y. 2014)................................................... 36

*United States v. Sampson*,
  898 F.3d 270 (2d Cir. 2018)................................................................ 23

*United States v. Siddiqi*,
  2007 WL 549420 (S.D.N.Y. 2007) ..................................................... 29

*United States v. Silver*,
  948 F.3d 538 (2d Cir. 2020)................................................................ 25

*United States v. Steppello*,
  664 F.3d 359 (2d Cir. 2011)................................................................ 32

*United States v. Sturdivant*,
  244 F.3d 71 (2d Cir. 2001).................................................................. 26

*United States v. Taylor*,
  71 F. Supp. 2d 420 (D.N.J. 1999) ...................................................... 21

*United States v. Trzaska*,
  111 F.3d 1019 (2d Cir. 1997).............................................................. 41

*United States v. Wagner*,
  989 F.2d 69 (2d Cir. 1993).................................................................. 32

*United States v. Wey*,
  256 F. Supp. 3d 355 (S.D.N.Y. 2017)................................................. 45

*United States v. Wey*,
  2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ............................................................... 14

*United States v. Wilbur*,
  674 F.3d 1160 (9th Cir. 2012) .................................................................................. 19

*United States v. Zarrab*,
  2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016) ........................................................... 17

*Washington v. Napolitano*,
  29 F.4th 93 (2d Cir. 2022) ....................................................................................... 40

*Whitfield v. United States*,
  543 U.S. 2092005) .................................................................................................... 26

*Young v. Conway*,
  698 F.3d 69 (2d Cir. 2012) ....................................................................................... 41

**Statutes**

15 U.S.C. § 78dd-2(a) ...................................................................................................... 5

15 U.S.C.A. § 78dd-2(a)(B) .......................................................................................... 27

18 U.S.C § 371 ........................................................................................................... 7, 23

18 U.S.C § 1956 ......................................................................................................... 7, 11

18 U.S.C.§ 1956(a)(2)(A) .............................................................................................. 17

18 U.S.C § 1956(A)(2)(B)(i) ........................................................................................... 9

18 U.S.C § 1956(h) ................................................................................................ 7,12, 32

18 U.S.C. 1957 ................................................................................................................. 9

18 U.S.C § 3282(a) .......................................................................................................... 7

18 U.S.C. § 3292 ............................................................................................................ 21

18 U.S.C. § 3292(a) ....................................................................................................... 21

18 U.S.C. § 3292(b) ....................................................................................................... 22

**Rules**

Fed. R. Crim. P. 8(a) .................................................................................................. 26

Fed. R. Crim. P.12(b) ................................................................................................. 5

Fed. R. Crim. P. 12(b)(3)(B)(v) ................................................................................. 13

Defendant Glenn Oztemel moves pursuant to Fed. R. Crim. P. ("Rule") 12(b) for

dismissal of the Superseding Indictment, or, alternatively, for a bill of particulars under Rule 7(f)

and, under the Fourth Amendment to the United States Constitution, to suppress evidence seized

from his email accounts after a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

## INTRODUCTION

The Superseding Indictment, ECF No. 76 (the "S1"), fails to plead the key component of

its charges—bribes— and the government's case is built on evidence seized in violation of the

Fourth Amendment.

**<u>Failure to State an Offense</u>**.  For an indictment charging violations of the Foreign

Corrupt Practices Act, *see* 15 U.S.C. § 78dd-2(a) (the "FCPA"), the S1 alleges little about bribes

to foreign officials, *see generally* S1.

According to the S1, between 2010 and 2018, Glenn Oztemel, Eduardo Innecco, and

Gary Oztemel bribed Rodrigo Berkowitz to secure "confidential information related to" the

business of Berkowitz's employer, Petroleo Brasileiro S.A. ("Petrobras"), "on behalf of" Trading

Company #1, Trading Company #2, and Oil Trade & Transport S.A. ("OTT"), so as to gain

"improper business advantages" in "trades with Petrobras."  S1 ¶ 2.  As concerns Glenn Oztemel,

the "scheme" allegedly involved repetition of the following:  (1) Berkowitz provided confidential

information to Innecco about a Petrobras cargo; (2) Innecco provided that information to Glenn

Oztemel, who used it for Trading Company #1 or #2 to buy the Petrobras cargo; (3) Trading

Company #1 or #2 paid Innecco a contractual commission related to the purchase of that cargo;

and (4) "Innecco paid a portion of the money he received from" Trading Company #1 or #2 to

Berkowitz.  *Id.* ¶¶ 2-6.  Given the government's charges, the S1 must include allegations of

corrupt payments from Innecco to Berkowitz—*i.e.*, to a "foreign official[]" at Petrobras—on

behalf of Glenn Oztemel. *Id.* ¶ 1; *see also United States v. Ng Lap Seng*, 934 F.3d 110, 132 (2d Cir. 2019) (core of FCPA violation is the "*quid pro quo* element"). But the S1 alleges **only two** wires from Innecco to Berkowitz: (1) in November 2012 and (2) in August 2016. *See* S1 ¶ 29r, ¶ 29aa (collectively, the "Innecco-Berkowitz Wires").

These two Innecco-Berkowitz Wires cannot sustain the alleged substantive FCPA and international money laundering ("IML") charges. *See* S1 ¶ 31, 36 (the "Substantive Counts"). The Substantive Counts are based on transfers of contractual commissions (or requests therefore) from Trading Company #2 to the Innecco Companies on five dates in 2018: (1) May 9; (2) June 12; (3) August 10; (4) September 12; and (5) November 13. *See id.* (collectively, the "Substantive Commissions"). Because Innecco was not (and is not alleged to have been) a foreign official, the Substantive Commissions cannot qualify as a corrupt payment to a foreign official, *see id.* ¶ 1, and can only constitute substantive offenses if Innecco then offered or paid some or all that money to Berkowitz on behalf of Glenn Oztemel, *see Ng Lap Seng*, 934 F.3d at 132. But the Substantive Commissions postdate the Innecco-Berkowitz Wires by approximately two (August 2016) and six years (November 2012). *See* S1 ¶ 29r, ¶ 29aa. Glenn Oztemel cannot have bribed Berkowitz in 2012 and in 2016 via his employer's 2018 Commissions to Innecco; this gap negates any inference of a connection, let alone a corrupt one, as required by the FCPA. According to the allegations in the S1, alleged bribe payments from Innecco to Berkowitz always postdated the corresponding commission payments from the Trading Companies to Innecco, a cadence that would comport with the FCPA's requirements. *See id.* ¶ 6 ("Innecco paid a portion of the money he received. . ."). The Substantive Counts have reversed that order—by pleading that the Innecco-Berkowitz Wires (2012 and 2016) preceded the Substantive Commissions in 2018—and cannot sustain violations of the FCPA and IML statutes.

The two alleged (November 2012, August 2016) Innecco-Berkowitz Wires also cannot sustain the FCPA and IML conspiracy charges, because they fall outside the statute of limitations. *See* S1 ¶¶ 1-29; 32-34 (the "Conspiracy Counts"). Both Conspiracy Counts, which allege an agreement to commit offenses against the United States in violation of 18 U.S.C. § 371 (Count One) and to commit offenses under 18 U.S.C § 1956 in violation of 18 U.S.C § 1956(h), are silent as to their limitations period; as a result, they are governed by a five-year statute of limitations. *See* 18 U.S.C § 3282(a). The S1 fails to allege any corrupt payment to Berkowitz (or any other foreign official) within five years before the return of the Indictment. Rather, the S1 alleges only contractual commission payments from Trading Company #2 to Innecco as overt acts within the five-year limitations period—but without any corresponding, subsequent corrupt payment to Berkowitz—and, therefore, cannot further a conspiracy. The statute of limitations bars Counts One and Five.

**Fourth Amendment**. The imperative of guarding warrant requirements for digital accounts is paramount, because the "sum of an individual's private life" is contained therein. *Riley v. California*, 573 U.S. 373, 394 (2014). The affidavits the government submitted in support of its applications to search Glenn Oztemel's Yahoo and Apple accounts relied principally on Rodrigo Berkowitz's statements to law enforcement. *See* October 16, 2023, Declaration of Nelson A. Boxer ("Boxer Decl.") Exh. A ¶¶ 17a-f (the "Yahoo Affidavit" or "Yahoo Aff."); Boxer Decl. Exh. B ¶¶ 21-22 (the "Apple Affidavit" or "Apple Aff."). The Yahoo and Apple Affidavits, however, withheld material information undermining Berkowitz's credibility from the Magistrate Judge adjudicating the applications. For example, the Affidavits omit: ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████. Moreover, the Apple Affidavit included █

████████████████████████████████████████████████

███████████████████████████████████████████. App.

Aff. ¶ 35a.  These material omissions were necessary to the probable cause findings and establish

a reckless disregard for the truth; a *Franks* hearing is merited.

Additionally, the government's execution of the Yahoo and Apple search warrants far

exceeded the scope authorized by the Magistrate Judge.  *See* Boxer Decl. Exh. C (the "Yahoo

Warrant" or "Yahoo SW"); Boxer Decl. Exh. D (the "Apple Warrant" or "Apple SW").  Both the

Yahoo and Apple Warrants imposed relevancy restrictions on what the government could seize.

*See* Yahoo SW ¶¶ IIa-k; Apple SW ¶¶ IIa-g.  Instead of complying with those restrictions by

running targeted searches to ensure that it would review and retain only responsive documents,

the government apparently seized the entirety of Glenn Oztemel's Yahoo and Apple accounts—

evidenced by the fact that it produced tens of thousands of obviously irrelevant and personal

emails from those accounts.  In fact, the data not in compliance with the Warrants' instructions

vastly outweighs data that is compliant.  Because this conduct displays a "flagrant disregard" for

the restrictions imposed by the Warrants, the fruits of those searches should be suppressed.

**BACKGROUND**

**I.    Procedural History.**

The grand jury indicted Glenn Oztemel and Eduardo Innecco on February 14, 2023.  *See*

ECF No. 1.  Glenn Oztemel was arrested in Miami on February 15, 2023, and was released on

bail the next day.  *See* ECF No. 5.  The Indictment was unsealed on February 17, 2023.  *See* ECF

No. 7.  Glenn Oztemel was first presented in this district—and arraigned—on February 27, 2023.

*See* ECF No. 17.  On May 10, 2023, the Court Ordered the defense to file its substantive motions by October 16, 2023.  *See* ECF No. 40.  And on August 29, 2023, the grand jury returned the S1, adding Gary Oztemel (Glenn Oztemel's brother) into the case.  *See* S1.  The S1 contains no new charges against Glenn Oztemel and Innecco.  *See id.*  In addition to charging Gary Oztemel with the same counts as Glenn Oztemel and Innecco, the S1 also charges Gary Oztemel with money laundering offenses under 18 U.S.C § 1956(A)(2)(B)(i) and 18 U.S.C. 1957.  *See id.* ¶¶ 37-38 (Count Eight); *id.* ¶¶ 39-40 (Count Nine).

## II.    The S1.

The S1 alleges that, between 2010 and 2018, Glenn Oztemel, Gary Oztemel, and Eduardo Innecco paid bribes to foreign officials—primarily, Rodrigo Berkowitz—at Brazil's state-owned and state-controlled oil and gas company, Petrobras.  *Id.* ¶ 2.[1]  During this period, Glenn Oztemel worked as an oil and gas trader at the Connecticut commodities firms, Trading Companies #1 and #2.  *Id.* ¶ 7, 29m.  Gary Oztemel owned OTT and a Connecticut-based entity, Petro Trade Services, Inc. ("Petro Trade.")  *Id.* ¶ 25.  Eduardo Innecco worked as an agent in Brazil for Trading Companies #1 and #2 pursuant to written contracts; he received his commissions, calculated based on the number of barrels of oil purchased by the Trading Companies, through the Innecco Companies:  Brazilian Chemicals, Albatross, Morgenstern, and Wertech.  *Id.* ¶ 9, 28e.  Innecco also allegedly entered a "profit sharing" arrangement with OTT whereby the Innecco Companies would receive a portion of OTT's profits on deals with Petrobras.  *Id.* ¶ 28e.  Finally, the S1 alleges that Rodrigo Berkowitz worked as an oil and gas trader at Petrobras; he also owned Uruguay Company.  *Id.* ¶ 15, 20.

---

[1] The S1 also alleges that Innecco paid bribes to "Petrobras Official #1 and others."  S1 ¶ 21.  There are no substantive allegations about these payments to "other" officials.

In short, the scheme allegedly involved the following four steps with respect to transactions for Petrobras cargos:

1. Berkowitz provided Innecco with "confidential information" (*e.g.*, competitor bids) related to a Petrobras cargo. *Id.* ¶¶ 2-3.

2. Innecco provided the "confidential information" to Glenn or Gary Oztemel—thereby providing Trading Company #1, Trading Company #2, or OTT with "improper business advantages" in its trade with Petrobras for that cargo. *Id.* ¶ 2.

3. Glenn Oztemel caused employees at Trading Company #1 or #2 to pay a commission reflected in Innecco's invoices related to the trade that closed using Berkowitz's information to an Innecco Company account in Switzerland or Uruguay. *Id.* ¶ 4.

4. Innecco "paid a portion of the money he received" from Trading Company #1, Trading Company #2, or OTT as a commission to Berkowitz as a bribe. *Id.* ¶ 6. The Innecco Companies made these payments to a "bank account in Uruguay" belonging to Berkowitz's Uruguay Company and "in cash." *Id.* ¶ 6, 29c.[2]

The S1 charges Glenn Oztemel with: (1) conspiracy to violate the FCPA, *see id.* ¶¶ 1-29 (Count One); (2) violation of the FCPA, *see id.* ¶¶ 30-31 (Counts Two, Three, and Four); (3) IML conspiracy, *see id.* ¶¶ 32-33 (Count Five)[3]; and (4) substantive IML offenses, *see id.* ¶¶ 35-36 (Counts Six and Seven).

In support of its FCPA Conspiracy Count, the S1 alleges forty "overt acts" between August 2010 and November 2018. *Id.* ¶¶ 29a-nn.[4] The Substantive FCPA Counts are premised on three Commissions (or requests therefore) from Trading Company #2 to the Innecco Companies in 2018: (1) a May 9, 2018, wire of $77,996.95 from Trading Company #2 to

---

[2] The S1 also alleges that Petrobras, OTT, and Trading Company #1 or #2 entered into "back-to-back" trades whereby: (1) Berkowitz would provide inside information to Innecco; (2) Innecco would provide the information to Gary and Glenn Oztemel; (3) OTT would purchase the Petrobras cargo and then immediately sell it to Trading Company #1 or #2 for a higher price; (4) OTT would pay a portion of its profits for the deal to an Innecco Company; and (5) Innecco would pay a portion of the money received from OTT to Berkowitz's Uruguay Company account. *See* S1 ¶ 5.

[3] Count Five alleges conspiracy to commit offenses under 18 U.S.C. § 1956, the object of which was (i) to promote a violation of the FCPA and (ii) an offense against a foreign nation involving bribery of a public official and the misappropriation/embezzlement of public funds by and for the benefit of a public official. The S1 does not contain allegations in support of misappropriation/embezzlement of public funds by and for the benefit of a public official.

[4] The S1 is a twenty-eight page "speaking indictment" that demarcates the government's theory of the case.

Wertech; (2) a June 12, 2018, wire of $107,541.17 from Trading Company #2 to Wertech; and (3) a September 12, 2018, email from Innecco to an employee of Trading Company #2, which attached two invoices and requested an $8,000 consultancy fee and a $103,570.08 commission. *See* S1 ¶ 31 (Counts Two, Three, and Four); *see also id.* ¶ 30 (incorporating prior paragraphs). And the S1 alleges two Substantive IML Counts based on: (1) an August 10, 2018, wire of $39,323.01 from Trading Company #2 to Wertech; and (2) a November 13, 2018, wire of $113,515.49 from Trading Company #2 to Wertech. *See* S1 ¶ 36 (Counts Six and Seven).

### III.    The Search Warrants.

Many of the overt acts described in the S1 in support of the FCPA Conspiracy Count are quotes from emails obtained from the execution of the Search Warrants issued by the United States District Court for the Eastern District of New York to Yahoo and Apple for Glenn Oztemel's accounts. *See id.* ¶¶ 29a-nn. FBI Special Agent ███████████ (the "Affiant") swore to the Yahoo and Apple Affidavits on April 28, 2020, and on February 23, 2021, respectively. *See* Yahoo Aff.; Apple Aff. Both Affidavits overwhelmingly rely on information provided by Rodrigo Berkowitz. *See* Yahoo Aff. ¶¶ 17a-f; Apple Aff. ¶¶ 21-22. All that the Affidavits state regarding Berkowitz's credibility is ████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████████████████ Yahoo Aff. ¶ 17 n.3; *see* Apple Aff. ¶ 21 n.1.

Both Warrants also include a description of the "Information to Be Seized by the Government" that restricts the government's searches of Glenn Oztemel's accounts to documents relevant to the crimes under investigation. *See* Yahoo SW ¶¶ IIa-k; Apple SW ¶¶ IIa-g. For

example, the government was entitled to seize records ███████████████████

███████████████████████████████████ Yahoo SW ¶ IIc; *see also id.* ¶ IIe

(███████████████████████████████████████████████████

███████████). However, of the 64,458 documents the government has produced that were seized

from Yahoo, at least 51,000 are outside the bounds of the Warrant—including tens of thousands

of obviously irrelevant, personal emails (*e.g.*, an email about a family vacation from Glenn

Oztemel's nephew; advertisements from retailers). *See* Boxer Decl. ¶ 7. Of the documents

defense counsel have reviewed, only 1,472 of the 64,458 documents seized pursuant to the

Yahoo Warrant are relevant. *See id.* None of the thirty-two documents produced from Glenn

Oztemel's Apple account is relevant to the crimes then under investigation. *Id.* ¶ 10.

## LEGAL STANDARDS

### I.    Rule 12(b).

"Since federal crimes are solely creatures of statute, a federal indictment can be

challenged on the ground that it fails to allege a crime within the terms of the applicable statute."

*United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (quotations omitted). Rule 12(b)

allows a defendant to move to dismiss for a "defect in the indictment" based on the "failure to

state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). An indictment survives such a motion, if it:

"(1) contains the elements of the offense charged and fairly informs a defendant of the charge

against him; and (2) allows him to plead acquittal or conviction to bar future prosecution on the

same offense." *United States v. Benjamin*, No. 21 Crim. 706, 2022 WL 17417038, at *3

(S.D.N.Y. Dec. 5, 2022) (citation omitted). In deciding such a motion, the court "views the

indictment as a whole and assumes its factual allegations to be true." *United States v. DeFilippo*,

No. 21 Crim. 128, 2023 WL 5000385, at *2 (D. Conn. Aug. 4, 2023) (quotations omitted). But

"the indictment must be considered as it was actually drawn, not as it might have been drawn," *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000), and the question is whether the "alleged activities, accepted as true, are prohibited by the statute," *United States v. Heicklen*, 858 F. Supp. 2d 256, 263 (S.D.N.Y. 2012).

## II.    Rule 7(f).

Rule 7(f) "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant (1) to prepare for trial, (2) to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citing Fed. R. Crim. P. 7(f)).  Courts grant a bill of particulars when "the charges of the indictment are so general that they do not 'advise the defendant of the specific acts of which he is accused.'" *United States v. Gasperini*, No. 16 Crim. 441, 2017 WL 2399693, at *10 (E.D.N.Y. June 1, 2017) (quoting *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004)).  Courts assess "the totality of the information available to the defendant, including the indictment and general pre-trial discovery," when ruling on a Rule 7(f) motion.  *United States v. Wey*, No. 15 Crim. 611, 2017 WL 237651, at *18 (S.D.N.Y. Jan. 18, 2017).

## III.   The Fourth Amendment.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause. . . ."  U.S. Const. amend. IV.  Probable cause to search a location exists where "a totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found' thereby."  *United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  A search pursuant to a warrant is "presumptively reasonable." *Id.* at 120 (citations omitted).  But this presumption can be overcome where a defendant shows

(1) material "falsehoods or omissions" that "were necessary to the issuing judge's probable cause" determination and (2) that the "inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth." *Id.* at 125-26. To analyze "necessity," courts consider whether probable cause would have existed based on "a hypothetical corrected affidavit" that deletes the falsehoods and inserts the omitted truths. *Ganek v. Leibowitz*, 874 F.3d 73, 82 (2d Cir. 2017). A defendant is entitled to a *Franks* hearing on a warrant affidavit's veracity if he or she makes a "substantial preliminary showing" of these two requirements. *United States v. McKenzie*, 13 F.4th 223, 236 (2d Cir. 2021) (citations omitted).

## ARGUMENT

**I. The Court Should Dismiss Counts One through Seven of the S1 for Failure to Allege a Violation of the FCPA and the IML Statute—or a Conspiracy to Commit those Offenses.**

The crux of any FCPA violation is a "*quid pro quo*" with a foreign official. *Ng Lap Seng*, 934 F.3d at 132; *see also United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012) (indictment must allege the "core of criminality" of an offense). Indeed, "bribery is generally understood to mean the corrupt payment or offering of something of value to a person in a position of trust with the intent to influence his judgment or actions." *Ng Lap Seng*, 934 F.3d at 131 (citing *Perrin v. United States*, 444 U.S. 37, 43–46 (1979)). The S1 is fatally silent on the "corrupt payments" to foreign officials that must constitute the core of its charges; Counts One to Seven should, therefore, be dismissed. *See, e.g.*, *Pirro*, 212 F.3d at 92 (affirming dismissal of tax fraud and perjury counts because conduct alleged did not violate applicable statute).

### A. The Substantive Counts Are Unconnected to Bribe Payments to Berkowitz.

The S1 charges Glenn Oztemel, Gary Oztemel, and Eduardo Innecco with two substantive offenses: (1) violation of the FCPA, *see* S1 ¶¶ 30-31 (Counts Two, Three, and Four),

and (2) IML to promote an FCPA violation, *see* S1 ¶¶ 30-31 (Counts Six and Seven).  Yet, none of the wires underlying these Substantive Counts involves a payment by Innecco (or anyone else) to Berkowitz—*i.e.*, a corrupt payment to a foreign official.  Rather, the Substantive Counts rely on payments from Trading Company #2 to the Innecco Companies.  These Substantive Commissions are not in-and-of-themselves corrupt payments to foreign officials and they are not alleged to tie to any corrupt payments to Berkowitz.

### 1.  Governing Law.

The S1 must allege the following elements with respect to the Substantive Counts.

**<u>FCPA</u>**.  An FCPA offense has seven elements.  *See United States v. Kozeny*, 667 F.3d 122, 135 (2d Cir. 2011) (affirming a seven-element jury instruction).  Specifically:

1.   the defendant was a "domestic concern" or an agent of a "domestic concern;"

2.  the defendant made use of "the mails or any means or instrumentality of interstate commerce" in furtherance of an unlawful act under the FCPA;

3.  the defendant acted "corruptly and willfully;"

4.  the defendant "offered, paid, promised to pay, or authorized the payment of money or of anything of value;"

5.  to a "foreign official" or to any person while "knowing that all or a portion of the payment or gift would be offered, given, promised directly or indirectly, to a foreign official;"

6.  for the purposes of (a) "influencing any act or decision of the foreign official in his or her official capacity," (b) "inducing the foreign official to do or omit to do any act in violation of the official's lawful duty," (c) "inducing the foreign official to use his or her influence with the foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality;" or (d) to secure any "improper advantage;" and

7.  the payment was for purposes of "obtaining or retaining business for or with or directing business to any person."

*See* Final Jury Charge, *United States v. Kozeny*, No. 11-5390, ECF No. 27 (Scheindlin, J.),

JA0403-JA408 (2d Cir. 2012); *see also Stichting Ter Behartiging Van de Belangen Van*

*Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 179–180

(2d Cir. 2003) (listing elements for a criminal FCPA offense).  Fundamentally, the government

must show a *quid pro quo—i.e.*, "a specific intent corruptly to give something of value in

exchange for action or decision"—not merely an after-the-fact payment to a foreign official for

actions already taken.  *Ng Lap Seng*, 934 F.3d at 132; *see id.* ("It is this *quid pro quo* element …

that distinguishes bribery from the related crime of illegal gratuity.") (citation omitted).

**IML**.  Under the IML statute, *see* 18 U.S.C.§ 1956(a)(2)(A), the government must

establish two elements:  the defendant "(1) transmitted or transferred a monetary instrument or

funds from a place in the United States to or through a place outside the United States or to a

place in the United States from or through a place outside the United States, (2) with the intent to

promote the carrying on of specified unlawful activity," *United States v. Zarrab*, No. 15 Crim.

867, 2016 WL 6820737, at *15 (S.D.N.Y. Oct. 17, 2016) (citing *United States v. Piervinanzi*, 23

F.3d 670, 680 (2d Cir. 1994)).  The statute includes "any felony violation of the Foreign Corrupt

Practices Act" as a "specified unlawful activity."  *United States v. Ho*, 984 F.3d 191, 202 (2d

Cir. 2020) (quoting 18 U.S.C. § 1956(c)(7)(D)).  Although the government need not demonstrate

that the international transfers "would promote subsequent criminal activity," *Piervinanzi*, 23

F.3d at 682, it must show that the international transfer was "integral to the success" of the

scheme or "essential to the completion of the scheme," *United States v. Inniss*, No. 21-1211,

2022 WL 5061706, at *1 (2d Cir. Oct. 5, 2022) (quotations omitted).  If the transfers are

"necessary to move bribe payments" or for defendants "to profit from the scheme," then this

element is satisfied.  *Inniss*, 2022 WL 5061706, at *1.

### 2. The Commission Payments Underlying the Substantive Counts Postdate the Alleged Bribes to Berkowitz by Years.

The Substantive FCPA Counts are premised on three Commissions from Trading Company #2 to the Innecco Companies (or requests therefore) in (1) May 2018, (2) June 2018, and (3) September 2018.  *See* S1 ¶ 31 (Counts Two, Three, and Four); *see also id.* ¶ 30 (incorporating prior paragraphs).  And the two Substantive IML Counts are based on Commissions in (1) August 2018 and (2) November 2018.  *See* S1 ¶ 36 (Counts Six and Seven). Thus, the earliest Substantive Commission occurred in May 2018.  For two reasons, the S1 fails to state an offense based on these Substantive Commissions.  *See United States v. Bankman-Fried*, No. 22 Crim. 673, 2023 WL 4194773, at *14 (S.D.N.Y. June 27, 2023) (analyzing whether "the indictment provides sufficient detail about the time, place, and nature of the alleged bribe" to plead a FCPA offense).

**First**, none of the Substantive Commissions involves a wire to a foreign official (*i.e.*, Berkowitz) such that it is connected to a FCPA violation.  There is nothing *per se* illegal about a payment from Trading Company #2 to its agent, Innecco; Innecco is not a foreign official.  *See* S1 ¶¶ 10-17 (enumerating the relevant foreign officials).[5]  These Commissions support a substantive FCPA offense only if they were made while knowing (or consciously avoiding knowing) that all or a portion of the Commission would be offered or given to Berkowitz in a corrupt exchange for inside information.  *See Kozeny*, 667 F.3d at 132.[6]  Similarly, the

---

[5] Trading Companies #1 and #2 made the commission payments to the Innecco Companies pursuant to written contracts.  *See, e.g.*, S1 ¶ 29m (describing a July 1, 2012, "Service Provision Agreement" between Trading Company #2 and Albatross).

[6] While the FCPA can be triggered by an "offer" of a bribe, the only "offer" described in the S1 occurred in Miami in October 2011.  *See* S1 ¶ 29f ("In or about October 2011, GLENN OZTEMEL and INNECCO attended a conference in Miami, Florida, which was also attended by Berkowitz and Petrobras Official #1.  At the conference, INNECCO told Berkowitz that Trading Company #1 would be willing to pay bribes of up to 25 cents per barrel on transactions directly with Trading Company #1, and that he could arrange for bribes of up to $1 per barrel for any transactions that used OTT to intermediate the transaction between Petrobras and Trading Company #1.").  This

Commissions underlying IML Counts are only unlawful if they are "essential" to FCPA violations—*i.e.*, if the money (1) flowed through Innecco to Berkowitz or (2) allowed co-conspirators to profit from the scheme. *See Inniss*, 2022 WL 5061706, at *1. The Court needs only look at indictments in other FCPA cases with similar fact patterns to understand how unusual it is for the S1 to not include any payment to a foreign official amongst its substantive counts. *See, e.g.*, Third Supr. Ind., *United States v. Hoskins*, 12 Crim. 238, ECF No. 209 ¶¶ 112-113 (D. Conn. Apr. 15, 2015) (international money laundering counts based on wires from consultant to foreign officials). None of the Substantive Commissions can by itself establish a violation.

**Second**, the S1 pleads no facts suggesting that the Substantive Commissions flowed through Innecco to Berkowitz—*i.e.*, it does not identify any corrupt payments to Berkowitz that corresponded to the 2018 Substantive Commissions. The S1 pleads **only two** Innecco-Berkowitz Wires: (1) a November 29, 2012, wire of $25,000 from Albatross to Uruguay Company; and (2) an August 15, 2016, wire of $19,390.85 from Morgenstern to Uruguay Company. *See* S1 ¶ 29r, ¶ 29aa. The "speaking" S1 does not allege that the 2018 Substantive Commissions from Trading Company #2 to the Innecco Companies were connected to these two Innecco-Berkowitz Wires in 2012 and 2016; how could it, given the order of wires (the S1 alleges commissions payment to Innecco always preceded corrupt payment to Berkowitz, not *vice versa*) and the chasm (two and six years) separating the transactions. *Cf. United States v. Wilbur*, 674 F.3d 1160, 1179 (9th Cir. 2012) (two-year gap in overt acts in alleged conspiracy rendered it two separate conspiracies with similar objectives). The S1 alleges that "corrupt" payments by Trading Company #1 or #2 to Innecco had a corresponding and subsequent payment from Innecco to Berkowitz, because

---

alleged "offer" is even farther removed from the Substantive Commissions and only applies to Trading Company #1.

Innecco paid the bribe for a particular deal **after** receiving his commission from the Trading Companies for that deal.  *See* S1 ¶ 6 ("Innecco paid a portion of the money **he received** from Trading Company #1, Trading Company #2, and OTT to Berkowitz and others as bribes.") (emphasis added).  Each bribe was allegedly tied to Innecco's commission for a specific Petrobras cargo that Trading Companies #1 or #2 had already purchased using Berkowitz's inside information.  *See, e.g.*, *id.* ¶ 29c ("Trading Company #1 wuld [sic] pay commission to either Morgenstern or Albatross . . . Morgenstern would make the distribution. . .").  Here, the alleged order does not plead a FCPA or an IML offense, because the Innecco-Berkowitz Wires predate the Substantive Commissions by years.

Simply put, given that the Substantive Commissions are temporally untethered from— and postdate—the two Innecco-Berkowitz Wires, the S1 does not plead (or even suggest) that the Substantive Commissions are part of a corrupt, explicit *quid pro quo* with a foreign official in 2018; the Substantive Counts, therefore, fail to state an offense.  *See Benjamin*, 2022 WL 17417038, at *14-16 (dismissing bribery count because the indictment failed to plead an explicit *quid pro quo*); *United States v. Donagher*, 520 F. Supp. 3d 1034, 1045 (N.D. Ill. 2021) (same); *see also Heicklen*, 858 F. Supp. 2d at 262 (indictment must state "at least the time and place" of the crime at issue) (citation omitted).

## B.  The Conspiracy Counts Are Barred by the Statute of Limitations.

Vast swaths of the conduct described in the S1 dates back over a decade.  *See* S1 ¶ 29a (first overt act on August 19, 2010).  The statute of limitations is designed "to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past."  *Toussie v. United States*, 397 U.S. 112, 114-15 (1970); *see also*

*United States v. Marion*, 404 U.S. 307, 322 (1971) (statute of limitations creates a "a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced"). Accordingly, statutes of limitations must be "liberally interpreted" in favor of defendants. *Toussie*, 397 U.S. at 115; *see also United States v. Poddle*, 105 F.3d 813, 819 (2d Cir. 1997) ("[T]he statute of limitations exists primarily to protect the rights of the defendant, not just to prevent the government from acting in bad faith.").

The S1 alleges two Conspiracy Counts: (1) conspiracy to violate the FCPA, *see* S1 ¶¶ 1-29 (Count One), and (2) conspiracy to commit IML, *see id.* ¶¶ 32-33 (Count Five). The Conspiracy Counts do not comport with the applicable five-year statute of limitations. *See United States v. Kozeny*, 493 F. Supp. 2d 693, 701 (S.D.N.Y. 2007) (five-year statute of limitations applies to FCPA and IML conspiracies) (citing 18 U.S.C § 3282(a)).

### 1. MLAT Tolling Does Not Apply.

Under 18 U.S.C. § 3292, the government may seek an Order suspending the running of the statute of limitations for up to three years while it seeks evidence from abroad using mutual legal assistance treaty ("MLAT") requests. *See* 18 U.S.C. § 3292(a) ("Upon application of the United States, filed before return of an indictment" the district court "shall suspend the running of the statute of limitations for the offense"). On April 6, 2023, government counsel informed defense counsel by phone that the government would not rely on the MLAT tolling provision under 18 U.S.C. § 3292 for the charges against Glenn Oztemel. *See* Boxer Decl. ¶ 12; *see also* ECF No. 45 at 19:3-20:23 (May 30, 2023, Conf. Tr.) ("My understanding from the Government's conversations is they're not relying on that tolling provision in [the] statute governing foreign assistance. So I accept that representation."). The government has since reversed this position, stating that it does not waive its reliance on MLAT tolling. *See* ECF No.

100 at 4 n.5.  The government should be held to its initial representation.  Accordingly, the

limitations cutoff for the Conspiracy Counts should be February 14, 2018—*i.e.*, five years prior

to the return of the original Indictment.  *See* ECF No. 1.

  However, even if the government is allowed to renege on its word, it is likely that the

statute of limitations would only be tolled for a short period—not the full three years allowable

under the statute.  The government states that it has made dozens of MLAT requests, *see* ECF

No. 100 at 4; however, the defense is aware of two applications to the Court for a tolling order

pursuant to Section 3292.  The first application, dated February 6, 2020, concerns the MLAT

request to Brazil issued on July 9, 2019.  *See* Boxer Decl. Exh. I.  The second application, dated

August 8, 2023, concerns the MLAT request to Brazil issued on September 15, 2022.  *See* Boxer

Decl. Exh. J.[7]  The period of suspension resulting from the first application would be the time

between the government's issuance of the MLAT and the date on which Brazil took final action

on the request.  *See* 18 U.S.C. § 3292(b).  Considering that the government stated that it's MLAT

request "related to information already in the Brazilian authorities' possession" and that it "did

not request that the Brazilian authorities obtain such evidence" on its behalf, the government

may have received the documents not long after its request on July 9, 2019.   *See* ECF No. 100 at

4 n.6.  Even with MLAT tolling, the last Innecco-Berkowitz Wire in August 2016 may fall

outside the five-year limitations period because the statute was tolled for less than a year and

half.  *See* S1 ¶ 29aa; *see Infra* Section I.B.2.  Despite repeated requests (and court inquiry), the

government has refused to produce its MLAT requests and, consistent with its initial

representation that it was not relying on MLAT tolling, has also not produced evidence of when

---

[7] The August 8, 2023, application is irrelevant for the purposes of tolling pursuant to Section 3292 since it was made after Glenn Oztemel's indictment on February 14, 2023.  *See United States v. Miller*, 830 F.2d 1073, 1076 (9th Cir. 1987) ("The statute itself specifies the only relevant time the application must be made:  'before return of an indictment.'") (quotations omitted).

Brazil complied with those requests—making it impossible to determine when Brazil took "final action."

If the government is permitted to rely on MLAT tolling despite its prior representations, then the Court should order the government to produce its MLAT requests and the dates Brazil produced documents so that the limitations cutoff can be calculated accurately.

### 2.    The FCPA Conspiracy Count Is Untimely.

The S1 charges a conspiracy to violate the FCPA under 18 U.S.C. § 371.  *See* S1 ¶¶ 1-29. Such a conspiracy has three elements:  "(1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offenses that were the objects of the conspiracy; and (3) commission of an 'overt act' by one or more members of the conspiracy in furtherance of the conspiracy."  *United States v. Allen*, 788 F.3d 61, 70 (2d Cir. 2015).  To satisfy the statute of limitations, "the (1) conspiracy must still have been ongoing within the five-year period preceding the indictment, and (2) 'at least one overt act in furtherance of the conspiratorial agreement must have been performed within that period.'"  *United States v. Ben Zvi*, 242 F.3d 89, 97 (2d Cir. 2001) (quoting *Grunewald v. United States*, 353 U.S. 391, 396-97 (1957) (alterations omitted)).  A defendant can "establish a statute-of-limitations defense via a Rule 12(b) motion" when "the defense is clear from the face of the indictment," because it does not raise "dispositive evidentiary questions."  *United States v. Sampson*, 898 F.3d 270, 279 (2d Cir. 2018); *see also United States v. Pham*, No. 12 Crim. 423, 2022 WL 993119, at *3 (S.D.N.Y. Apr. 1, 2022) (same).

The Superseding Inditement alleges forty affirmative acts in furtherance of the FCPA Conspiracy.  *See* S1 ¶¶ 29a-nn.  Most of this conduct (twenty eight out of forty overt acts) occurred well outside of the limitations period—*i.e.*, before February 14, 2018.  *See id.* ¶¶ 29a-bb

(describing conduct between August 2010 and August 2017).  The twelve acts alleged within the statutory period fall into three categories:

1. Five payments from Trading Company #2 to Wertech.  *See id.* ¶ 29ee, ff, hh, ii, jj.

2. Six payments from Wertech to Petro Trade.  *See id.* ¶ 29cc, dd, kk, ll, mm, nn.

3. One WhatsApp conversation between Innecco and Berkowitz, where Innecco stated that he sent "G" information on "bids from Trading Company #2's competitors for several Petrobras cargos."  *See id.* ¶ 29gg.

These allegations are insufficient to make the FCPA Conspiracy timely.

Not all conduct by a co-conspirator is an "overt act"—only conduct that advances the conspiracy's goal qualifies.  *See Grunewald*, 353 U.S. at 414 ("[O]vert acts in a prosecution such as this one are meaningful only if they are within the scope of the conspiratorial agreement."); *United States v. Rosenblatt*, 554 F.2d 36, 39 (2d Cir. 1977) ("Because overt acts are acts to effect the object of the conspiracy, they are defined by reference to the conspiratorial agreement.") (quotations omitted).  Courts determine the conspiracy's goal or scope by examining the indictment.  *See United States v. Grimm*, 738 F.3d 498, 502 (2d Cir. 2013); *see also United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001) ("To determine the scope of the alleged conspiratorial agreement, the court is bound by the language of the indictment.").  Here, the S1 alleges that the "purpose of the conspiracy was . . . to offer, promise, and pay bribes to foreign officials, including Berkowitz, in order to obtain and retain business with Petrobras, for and with, and direct business to, Trading Company #1, Trading Company #2, and OTT."  S1 ¶ 29.  For two reasons, the alleged actions after the limitations cutoff are not "overt acts" in furtherance of the charged conspiracy.

**First**, none of the timely alleged overt acts involves a payment to a foreign official or is connected to the Innecco-Berkowitz Wires that predate them by years.  *See Supra* Section I.A; *cf.*

*United States v. Gotti*, 457 F. Supp. 2d 411, 429 (S.D.N.Y. 2006) (dismissing a money laundering count because the defendant could not be guilty of "money laundering for liquidating assets purchased with the proceeds of racketeering over a decade ago").  The S1 does not plead (and the government has not produced evidence of) any Innecco-Berkowitz Wire within the statutory period; the last Innecco-Berkowitz Wire occurred on August 15, 2016—well outside the limitations period.  *See* S1 ¶ 29aa; *see Infra* Section I.C.  Without money flowing to Berkowitz after August 2016, commission payments from Trading Company #2 to Wertech in 2018 are not in furtherance of a conspiracy to pay bribes.  *See Grimm*, 738 F.3d at 503 ("[O]vert acts have ended when the conspiracy has completed its influence on an otherwise legitimate course of common dealing that remains ongoing for a prolonged time, without measures of concealment, adjustment or any other corrupt intervention by any conspirator.").  Similarly, even if Berkowitz continued to provide confidential information to Innecco in the hopes of receiving further payments, *see* S1 ¶ 29gg ("5 messages to G overnight"), it would not constitute an overt act if it occurred after bribery payments ceased, *see United States v. Silver*, 948 F.3d 538, 573-74 (2d Cir. 2020) ("noncriminal" referrals to politician after the end of a bribery scheme that were only "intended to curry generalized goodwill" were not overt acts).  Indeed, as Berkowitz informed the government two months ago, ████████████████████████ ████████████████████████████████████████ ████████████████████████████████  Boxer Decl. Exh. S at 6 (emphasis added).

**Second**, the wires from the Innecco Companies to Petro Trade (owned by Gary Oztemel) are not overt acts in furtherance of the conspiracy, because they do not advance the aims of the conspiracy and therefore are not "within the scope of the conspiratorial agreement."  The

allegation is that money flowed from Trading Company #1 or Trading Company #2 to Innecco, and then from Innecco to Berkowitz. *See* S1 ¶¶ 1-6. The S1 does not plead any basis for finding that a diversion of a portion of Innecco's commission from Trading #2 to Petro Trade in 2018 was in furtherance of an agreement to pay bribes to receive confidential information from Berkowitz in order to achieve an unfair business advantage for Glenn Oztemel or Trading Company #2. The S1 in fact illustrates this point by charging Gary Oztemel—and only Gary Oztemel—with money laundering relating to these wires from the Innecco Companies to Petro Trade. *See id.* ¶¶ 37-38 (Count Eight); *id.* ¶¶ 38-40 (Count Nine). The government cannot extend the scope of the conspiracy into the limitations period by tacking on unrelated conduct. *See United States v. Kerik*, 615 F. Supp. 2d 256, 269 (S.D.N.Y. 2009) (dismissing based on the statute of limitations where timely-alleged overt acts were not "in furtherance" of a scheme that had already "necessarily terminated").

In fact, the S1's total failure to plead how the payments from the Innecco Companies to Petro Trade in 2018 relate to the alleged scheme to bribe Berkowitz suggests that they are part of a separate scheme; the FCPA Conspiracy Count should also be dismissed as duplicitous. *See United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) ("An indictment is impermissibly duplicitous where: (1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and (2) the defendant is prejudiced thereby."); *see also United States v. Burfoot*, 899 F.3d 326, 337 (4th Cir. 2018) ("[W]hen an indictment impermissibly joins separate offenses that occurred at different times, prosecution of the earlier acts may be barred by the statute of limitations") (quotation omitted).

### 3.  The IML Conspiracy Count Is Untimely.

A conspiracy to launder money under Section 1956(h) does not require an overt act.  *See Whitfield v. United States*, 543 U.S. 209, 214 (2005).  When a conspiracy statute does not require an overt act, "the court will presume, absent contrary evidence, that a conspiracy exists indefinitely if it contemplated a continuity of purpose and a continued performance of acts." *United States v. Carpenter*, No. 13 Crim. 226, 2015 WL 9305638, at *5 n.3 (D. Conn. Dec. 21, 2015).  Accordingly, for the statute of limitations to bar an IML conspiracy, the defendant needs to "show either that the conspiracy was terminated, or that [he] withdrew." *United States v. Kozeny*, 638 F. Supp. 2d 348, 353 (S.D.N.Y. 2009).  The "'crucial question' for statute of limitations purposes is 'the scope of the conspiratorial agreement,' which must be informed by the purpose of the conspiracy." *Id.* at 354 (quoting *United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir. 1982)).  Because an IML conspiracy to promote a FCPA violation is "economic"—i.e., "a person does not violate the FCPA without expecting to receive something in return"—the question is whether the defendant has already "benefitted" from what "he was promised in exchange for the bribes that he paid." *Id.*

In this case, the S1 alleges that Eduardo Innecco paid bribes to Rodrigo Berkowitz **after** Trading Company #1 or #2 "benefitted" from Berkowitz's inside information—*i.e.*, after Trading Company #1 or #2 purchased the Petrobras cargo in question and paid Innecco a per barrel commission for that cargo.  *See* S1 ¶¶ 1-6.  The S1 alleges that the payment from Innecco to Berkowitz was the last step in the bribery scheme—occurring after Innecco received his commission for a particular deal.  *Id.*  The last Innecco-Berkowitz Wire plead in the S1 occurred in August 2016.  Without bribes moving to Berkowitz after 2016, no ongoing conspiracy existed for purposes of the statute of limitations, and the IML Conspiracy charge is untimely.

### C.  Berkowitz Is Not a "Foreign Official" Because Petrobras Is Not an "Instrumentality" of Brazil.

Berkowitz is not a "foreign official" within the meaning of the FCPA, because Petrobras is not an "instrumentality" of a foreign government under the FCPA.  *See* 15 U.S.C.A. § 78dd-2(a)(B) (FCPA defines a "foreign official" as "any officer or employee of a foreign government or any department, agency, or instrumentality thereof").  A state-owned and controlled corporation can be—but is not necessarily—an "instrumentality" of a foreign government under the FCPA.  *See United States v. Duperval*, 777 F.3d 1324, 1333 (11th Cir. 2015); *see also United States v. Carson*, No. 09 Crim. 77, 2011 WL 5101701, at *9 (C.D. Cal. May 18, 2011) ("[S]imply assuming that a company is wholly owned by the state is insufficient for the Court to determine as a matter of law whether the company constitutes a government 'instrumentality.'").  The Brazilian government's ownership and control over Petrobras is limited.  *See* Non-Prosecution Agreement, Petroleo Brasileiro S.A., U.S. Dept' J. (Sept. 26, 2018) (Brazilian government directly owns approximately 50.26% of Petrobras common shares with voting rights with the remaining 49.74% owned by public shareholders on the New York Stock Exchange); *see also Carson*, 2011 WL 5101701, at *9 (examining the "[f]oreign state's degree of control over the entity" and "foreign state's extent of ownership of the entity" to determine if a state owned company was an "instrumentality").

Because Petrobras is not an "instrumentality" of Brazil within the meaning of the FCPA, Berkowitz is not a "foreign official" as defined in the FCPA, and the S1 fails as a matter of law.

## II.  Even if the Court Does Not Dismiss, It Should Order a Bill of Particulars that Identifies the Bribes to Foreign Officials upon which the Charges Are Based.

Even if the Court does not dismiss the S1, it should order the government to provide a Bill of Particulars identifying the corrupt payments to foreign officials that allegedly relate to (1)

the 2018 Commissions underlying the Substantive Counts and (2) the conduct within the limitations period denominated as "overt acts."  *See* S1 ¶¶ 29bb-kk, 31, 36.  Glenn Oztemel requested particulars from the government by letter dated and emailed on March 3, 2023, including multiple requests for particulars about the alleged bribe payments from Innecco to Berkowitz.  *See, e.g.*, Boxer Decl. Exh. K ("Describe and quantify the 'portion of the money' Innecco paid as bribes' from the total "he received from Trading Company #1 and Trading Company #2.").  By letter dated March 8, 2023, the government declined to provide any particulars.  *See* Boxer Decl. Exh. L.

Courts require the government to identify specific transactions via a Bill of Particulars where (as here) an indictment charges a financial crime but does not identify the underlying transactions upon which the indictment is predicated.  *See, e.g.*, *Bortnovsky*, 820 F.2d at 574-75 (vacating convictions for insurance fraud where indictment did not identify which insurance submissions were allegedly false); *United States v. Hawit*, No. 15 Crim. 252, 2017 WL 663542, at *11 (E.D.N.Y. Feb. 17, 2017) ("[T]he Government shall file a bill of particulars specifying the transactions . . . that the Government will seek to prove were tainted by an unlawful conspiracy. . ."); *United States v. Murgio*, 209 F. Supp. 3d 698, 723 (S.D.N.Y. 2016) (ordering the "the Government to identify the dates, locations, and amounts of any bribes. . ."); *United States v. Siddiqi*, 2007 WL 549420, at *2 (S.D.N.Y. 2007) (ordering disclosure of "the approximate date and amount" of all alleged bribes and "the identity of the [persons] who made such payments"); *United States v. Ganim*, 225 F. Supp. 2d 145, 155 (D. Conn. 2002) (ordering a bill of particulars to identify bribes provided to the defendant); *United States v. McGuinness*, 764 F. Supp. 888, 894 (S.D.N.Y. 1991) (requiring disclosure of "[t]he approximate amount and date of each [bribe] payment … as well as the name of the person making the payment").

24

The S1's silence on the money flow to Berkowitz after August 2016 is not absolved by the government's production of massive amounts of discovery. *See Bortnovsky*, 820 F.2d at 574 (bill of particulars not ordinarily required where the information is provided "in some acceptable alternate form"). Courts recognize that a Bill of Particulars is, in fact, most necessary when (as here) the government has buried the defense under an avalanche of paper. *See id.* at 575 ("The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided. . ."); *see also Wey*, 2017 WL 237651, at *18 ("[I]t is no solution to rely solely on the quantity of information disclosed by the government because sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars."); *United States v. Rajaratnam*, No. 09 Crim. 1184, 2010 WL 2788168, at *3 (S.D.N.Y. July 13, 2010) ("Given the complexity of this case, and the fact-intensive nature of its allegations about inside information, the defendants are entitled to some additional particulars. . ."); *U.S. v. Mahaffy*, 446 F. Supp. 2d 115, 119 (E.D.N.Y. 2006) ("Perhaps the most frequent case in which particulars are warranted is where discovery is overwhelmingly extensive.").

Moreover, the discovery produced demonstrates that the August 15, 2016, Innecco-Berkowitz Wire identified in the S1 is the last wire from Innecco to Berkowitz. Berkowitz is only alleged to have received wires from Innecco through Uruguay Company, *see* S1 ¶ 20, 28e, and the government has produced only one set of bank records for Uruguay Company, *see* Boxer Decl. Exh. O. Those bank records demonstrate that ████████████████████████████ ████████████████████████████████████████████████. *See id.* at 183-184. In fact, those bank records show that ████████████████████████████████████████████████████████ ████████. *See id.* at 61. Accordingly, the discovery does not suggest that the 2018 wires in the Substantive Counts from Trading Company #2 to the Innecco Companies related to any corrupt

payments from Innecco to Berkowitz's Uruguay Company in 2018. *Cf. United States v. Nerlinger*, 862 F.2d 967, 974-75 (2d Cir. 1988) (defendant withdrew from conspiracy by closing bank accounts where he received fraud proceeds). The defense is blind as to what corrupt payments to Berkowitz in 2018 underlies this case.

Furthermore, the discovery produced demonstrates that ████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████. Boxer Decl. ¶ 17; *see Infra* Section III.A.1.a. ████████████████████████ ████████████████████████████████. Given that the commissions underlying the Substantive Counts and timely overt acts are unlawful only if connected to corrupt payments from Innecco to Berkowitz, the government should identify the allegedly related corrupt payments. Otherwise, the defense is left in the dark.

Finally, the S1 states that the Defendants committed offenses "in violation of the Brazilian Penal Code" without identifying what provisions of the Brazilian Penal Code were allegedly violated. *See* S1 ¶ 33, 36. The Court should Order the government to identify those provisions.

**III.    The Court Should Suppress Glenn Oztemel's Emails Because the Government Violated His Fourth Amendment Rights.**

The government violated Glenn Oztemel's Fourth Amendment rights by omitting key information from its Warrant Affidavits and by exceeding the scope of the Warrants.

**A.    The Court Should Suppress the Evidence from the Searches of Glenn Oztemel's Yahoo and Apple Accounts, After a *Franks* Hearing.**

The government violated Glenn Oztemel's Fourth Amendment rights when it seized emails from his Yahoo and Apple accounts.

## 1. The Yahoo Search Warrant Affidavit Withheld Material Information in Bad Faith.

The Yahoo Search Warrant should be suppressed because the Affiant: (1) made material omissions that were (2) necessary to a finding of probable cause and were (3) made deliberately or in reckless disregard of the truth. *Lauria*, 70 F.4th at 125-26. The Court should hold a *Franks* hearing, because Glenn Oztemel herein makes a "substantial preliminary showing" of these requirements. *McKenzie*, 13 F.4th at 236.

### a. Material Omissions.

The Yahoo Affidavit relies primarily on Rodrigo Berkowitz's statements to establish Glenn Oztemel's knowledge of bribe payments. *See id.* ¶¶ 17a-f. In analyzing probable cause based in whole or in part on information provided by a criminal informant, a court must consider the "informant's veracity, reliability and basis of knowledge, and the extent to which an informant's statements—even about a suspect's innocent activities—are independently corroborated." *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004) (citing *Gates*, 462 U.S. at 241-44; *United States v. Canfield*, 212 F.3d 713, 719 (2d Cir. 2000)). In evaluating search warrants, the Second Circuit has "cautioned that a criminal informer is less reliable than an innocent bystander with no apparent motive to falsify." *United States v. Steppello*, 664 F.3d 359, 365 (2d Cir. 2011). Accordingly, information from criminal informants must be scrutinized by the reviewing Magistrate Judge particularly where, as here, the informant's track record is untested. *See United States v. Wagner*, 989 F.2d 69, 72–73 (2d Cir. 1993).

The Yahoo Affidavit omitted material information necessary to permit the Magistrate Judge to analyze the credibility of Berkowitz's allegations in assessing probable cause. All the Yahoo Affidavit stated regarding Berkowitz was that ███████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████    Yahoo

Aff. ¶ 17 n.3.  This description was inadequate, given the significant impeachment information

known to the Affiant when he swore to the Yahoo Affidavit on April 28, 2020.  *Id.* ¶ 42.

Specifically, the Affiant, who appears to have been the case agent from the outset of the

government's investigation, knew (or should have known) at least the following six material

facts.

> **First**, ████████████████████████████████████    *See* ECF

No. 74-9 at 2.  ███████████████████████████████████████

████████████████████████████.  *See id.*  █████████████████████

█████████████████.  *See id.*  ██████████████████████████████

███████████████████████████████████████████████

█████████████████.  *See id.*  ██████████████████████████████

█████████████████  *See id.*  ████████████████████████████████

████████████████████████

> **Second**, ██████████████████████████████████████

█████████████████.  *See id.*  ██████████████████████████

███████████████████████████████████████████████████

██████████  ████████████████████████████████

████████████████████████████████████████████████

█████████████████████

> **Third**, █████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████    *See* ECF No. 104 at Exh. A. ██████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████    *Id.* (emphasis added).  ███████████████

██████████████████████████████████████████

██████████████████████. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████.

**Fourth**, ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████. ████████:

1.  ██████████████████████████████████████
    ████████████████████████████████████████████
    ████████████████████████████████████. *See*
    Boxer Decl. Exh. P.

2.  ████████████████████████████████████████████
    ████████████████████████████████████
    ████████████████. *See* Boxer Decl. Exh. P; *see* S1 ¶ 19.

3. ███████████████████████████████████
███████████████████████████ *See* Boxer Decl. Exh. T.

████████████████████████████████████████████████

█████████████████.

**<u>Fifth</u>**, ██████████████████████████████████████

███████████████████████████████████████████. *See*
Boxer. Decl. Exhs. U-V. ████████████████████████████

█████████████████████████. *See* Boxer Decl. ¶ 17. ████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████ *See id.* ██████████████████

████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████ Yahoo Aff. ¶ 42.

And **<u>sixth</u>**, █████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

█████████████████████████ The Affiant did not disclose these

exculpatory statements to the Magistrate Judge.

In sum, given that Berkowitz's "credibility is plainly relevant—even critical—to the probable cause determination," the failure to provide "known information that goes directly to the credibility" is material. *McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 825 (2d Cir. 2014).

### b. Necessary to Probable Cause.

The above material omissions were "necessary" to the Judge's finding of probable cause—given that the grounds stated for probable cause to search Glenn Oztemel's Yahoo account were slim. *See United States v. Lahey*, 967 F. Supp. 2d 698, 724 (S.D.N.Y. 2013) (suppressing where government "face[d] a steep uphill climb" with respect to materiality because the "hypothetical corrected affidavit is a thin reed on which to base a search").

██████████████████████████████████████████████████. *See* Yahoo Aff. ¶¶ 17a-f.  Conclusory claims cannot establish probable cause. *See United States v. Rutherford*, 71 F. Supp. 3d 386, 392 (S.D.N.Y. 2014) ("[A] conclusory legal allegation is insufficient to establish the existence of probable cause sufficient to support the issuance of a search warrant.") (citations omitted); *see also Gates*, 462 U.S. at 234 (informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weigh"). ███████████████████████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████

Yahoo Aff. ¶ 17f.  The Yahoo Affidavit provided no firsthand (or even secondhand) support for this statement. ████████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████ Other allegations in the Yahoo Affidavit are equally cursory. *See, e.g.*, *id.* ¶ 17c (███████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████). This

was inadequate for probable cause based on a statement from a criminal informant, especially

when coupled with the information about Berkowitz that was omitted from the Affidavit.  *See*

*Gates*, 462 U.S. at 239 (issuing judge's "action cannot be a mere ratification of the bare

conclusions of others").

The paucity of probable cause detail in the Yahoo Affidavit is stark when measured

against search warrant affidavits that courts have found established probable cause based upon

information provided by a criminal informant.  *See, e.g.*, *United States v. Reed*, 409 F. App'x

471, 474 (2d Cir. 2011) (summary order) (affidavit based on informant supported probable cause

where it provided "detailed descriptions" that included "not only the basis for the informant's

knowledge but also the type and amount of drugs being sold, the type of guns present, the layout

of the premises, and the appearance of the perpetrators").

The Yahoo Affidavit also relied on the Affiant's descriptions of eleven emails to/from

Innecco and Glenn Oztemel's Yahoo accounts.  *See* Yahoo Aff. ¶¶ 18-34.  The emails cannot

sustain probable cause with respect to Glenn Oztemel's Yahoo account for several reasons.  *See*

*generally Lahey*, 967 F. Supp. 2d at 711-730 (sufficiency of affidavit analyzed on a defendant-

by-defendant basis).

- ████████████████████████████████████████████████

███████████████████████████████████████.  *See* Yahoo Aff. ¶

24, 26, 27, 28, 30. ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

████████

-     ███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████  ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

-     The emails described in the Affidavit range from April 2011 to February 2018. Even if these emails could have established probable cause to search Glenn Oztemel's Yahoo account proximate to when they were sent/received, any such probable cause was "stale" when the Affiant swore to the Yahoo Affidavit in April 2020. *See United States v. Raymonda*, 780

F.3d 105, 117 (2d. Cir. 2015) (no probable cause existed "on the basis of nine-month-old evidence" showing "that the suspect had at some point accessed thumbnails of child pornography").  Here, even according to the government, the alleged scheme was over for two years at the time of the Yahoo Affidavit (three years by the time of the Apple Affidavit), and most of the conduct at issue went back a decade; any probable cause that may have existed had already dissipated.

Finally, the Affiant's purported "expertise"[8] that criminals (just like law abiding citizens) communicate via email (if they were engaging in criminal activity, it would make more sense that they would not be communicating by email) does not establish probable cause to search an email account.  *See United States v. Griffith*, 867 F.3d 1265, 1273 (D.C. Cir. 2017) (affiant's "training and experience" that drug dealers use cell phones did not create probable cause for a search of defendant's home for a cell phone); *see also United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013) (noting "a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant").  Indeed, even when the government has probable cause to believe someone committed a crime, it does not trigger a general license to search their digital accounts.  *See United States v. Garcia*, No. 20 Crim. 58, 2023 WL 4850553, at *7 (D. Conn. July 28, 2023) (Dooley, J.) (suppressing because probable cause to believe the defendant committed a crime did not create probable cause to believe evidence of the crime would be on his phone).  Employing the Affiant's logic, the government would always be entitled to search a suspect's email accounts.

---

[8] The Affiant devotes a large portion of the Yahoo Affidavit to ███████████████████ *See* Yahoo Aff. ¶¶ 35-40. ████████████████████████████████████████████████ *Id.* ¶ 40.

### c. Recklessness.

"In the case of an omission, recklessness may be inferred 'where the omitted information was 'clearly critical' to the probable cause determination.'" *United States v. Disla Ramos*, No. 22 Crim. 431, 2022 WL 17830637, at *8 (S.D.N.Y. Dec. 21, 2022) (quoting *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991)). Recklessness can also be inferred when a series of omissions all "drive in the same direction" towards strengthening the government's case for probable cause. *Lahey*, 967 F. Supp. 2d at 723.

The Affidavit stated that the Affiant had nine years' experience in 2020. *See* Yahoo Aff. ¶ 2. Given that experience, the material omissions at issue were (at minimum) reckless, and they, among other things, bolstered Berkowitz's credibility by downplaying his motivation, history, and propensity to lie. The Affiant denied the Magistrate Judge the opportunity to accurately assess the totality-of-circumstances for probable cause. *Cf. Washington v. Napolitano*, 29 F.4th 93, 107 (2d Cir. 2022) ("[B]y omitting the exculpatory information in the arrest warrant affidavit, appellants deprived the judge of the fair ability to make the necessary assessment of whether the 'story holds water' for probable cause purposes."). This conduct constitutes reckless disregard for the truth, necessitating a *Franks* hearing.

### 2. The Apple Search Warrant Affidavit Withheld Material Information and Deceptively Edited Email Evidence.

The Apple Affidavit made the same material omissions and conclusory statements as the Yahoo Affidavit. *See Supra* Section II.A. The Apple Affidavit, however, contains at least two additional, at best reckless defects beyond those contained in the Yahoo Affidavit.

**First**, the Affiant engaged in misleading editing to remove the exculpatory portion of an email, which necessarily mislead the Magistrate Judge. The Apple Affidavit provided the following quote from an October 14, 2011, email from Innecco to Glenn Oztemel:



App. Aff. ¶ 35a (alterations omitted).  After providing this quote, the Affiant explained that in

*Id.*

Looks incriminating; detailed; comprehensive.  But only because the Affiant edited out

the latter half of the email chain:

- On March 26, 2012, Glenn Oztemel responded to this email: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- To which Innecco replied: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Boxer Decl. Exh. H (emphasis added).  Thus, if the Affiant had included the entire email chain in

the Affidavit, it would have provided evidence to the Magistrate Judge that Glenn Oztemel was

ignorant of the bribery scheme (*i.e.*, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) and that

Innecco has concealed his bribery from Glenn Oztemel (*i.e.*, ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮).  Given the Affidavits' reliance on emails (which do not explicitly discuss

bribes) to establish an inference that Glenn Oztemel knew about and participated in a bribery

scheme, the omitted portions of this email—which negates any inference of such knowledge—

are of exponential significance.  This deceptive editing is undoubtedly reckless—especially

given the Affiant's awareness that Rodrigo Berkowitz had already tampered with email

evidence.

**Second**, the Apple Affidavit relies heavily on emails returned by the Yahoo Search Warrant.  *See* Apple Aff. ¶¶ 34a-36h ██████████████████████████).  Under the "exclusionary rule," courts suppress both the "direct products" and the "indirect or derivative fruits" of an illegal search.  *See Young v. Conway*, 698 F.3d 69, 77 (2d Cir. 2012).  Because the Apple Search Warrant depended significantly on evidence obtained from the Yahoo Search Warrant, the Court should suppress the "tainted" evidence obtained from the Apple Warrant as well.  *See United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997) (suppression is required unless subsequent warrant affidavit, "excised of the tainted evidence," establishes probable cause).  The Apple Search Warrant returns are "fruit of the poisonous tree."  *United States v. Cacace*, 796 F.3d 176, 188 (2d Cir. 2015).[9]

### B.  The Government's Search of Glenn Oztemel's Yahoo and Apple Accounts "Flagrantly Disregarded" the Scope Allowed under the Warrants.

"[B]oth the scope of a seizure permitted by a warrant, and the reasonableness of government conduct in executing a valid warrant, can present Fourth Amendment issues." *United States v. Ganais*, 824 F.3d 199, 209–10 (2d Cir. 2016) (en banc) (citations omitted). When the government exceeds the scope of a warrant, the remedy is ordinarily to suppress the evidence that falls outside the scope of the warrant.  *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) (citations omitted).  However, "suppression of all evidence seized is justified where those executing the warrant acted 'in flagrant disregard' of the warrant's terms."  *Id.* (citations omitted). "Government agents flagrantly disregard the terms of a warrant so that wholesale suppression is required only when (1) they effect a widespread seizure of items that

---

[9] Where (as here) suppression is appropriate because the government omitted information in reckless disregard for the truth, the "good faith" exception to the exclusionary rule does not apply.  *See Lauria*, 70 F.4th at 131; *see also United States v. Ganias*, 824 F.3d 199, 221 (2d Cir. 2016) ("[T]o assert good faith reliance successfully, officers must, *inter alia*, disclose all potentially adverse information to the issuing judge.").

were not within the scope of the warrant, and (2) do not act in good faith." *United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (internal citations and quotation marks omitted).  For the first prong, courts analyze whether the government's conduct resembled a "general search"—*i.e.*, a "wide-ranging exploratory search" that involves a "widespread seizure of items" and suggests "indiscriminate rummaging." *Id.*  Here, the government "flagrantly disregarded" the restrictions imposed by the Warrants.

The government failed to comply with the content restrictions imposed by the Warrants. When a warrant restricts the government to searching/seizing only relevant electronic data, the proper procedure is for the government to conduct a "responsiveness review" within a "reasonable time." *See United States v. Nejad*, 436 F. Supp. 3d 707, 734 (S.D.N.Y. 2020) (citing Fed. R. Crim. P. 41(e)(2)(B)).  "The objective of such a responsiveness review is 'to determine whether the evidence that the government seized fell within the scope of the categories of information sought in the search warrants.'" *Id.* (quoting *United States v. Metter*, 860 F. Supp. 2d 205, 214–15 (E.D.N.Y. 2012)).  Once completed, the non-responsive material must be walled off from the investigation team. *Id.* at 736.  Both Warrants contain multiple limitations on the

███████████████████████████████████████—designed to limit the government's search and seizure to materials relevant to investigation as described in the supporting Affidavits.  *See* Yahoo SW ¶¶ IIa-k; Apple SW ¶¶ IIa-g.  For example:



- ████████████████████████████████████
  ████████████████████████████████████
  ██████████████████████████████   Yahoo SW ¶ IIa.

- ████████████████████████████████████
  ██████████████████████████████████
  ████████████████████████████████████
  ██████████████████████   Apple SW ¶ IIa.

Accordingly, the Warrants did not authorize the government to search and seize all Glenn

Oztemel's digital data; rather, they authorized the government to search and seize only data

relevant to its investigation.

Instead of running targeted searches, as required by the Magistrate Judge who issued the

Warrants, to ensure review and retention of only responsive documents, the government

executed a "general search warrant"—grabbing the entirety of Glenn Oztemel's accounts and

rummaging through them.  As a result, the government has produced tens of thousands of

obviously irrelevant, personal emails (*e.g*., about Glenn Oztemel's vacation with his nephew;

sale offers from Bloomingdales; etc.) that never should have been seized from Glenn Oztemel's

Yahoo and Apple accounts.  *See* Boxer Decl. Exhs. G-H.  In fact, defense counsels' review

suggests that at least 51,000 of the 64,458 emails the government seized from Glenn Oztemel's

Yahoo account are non-responsive—as are all 32 documents seized from Glenn Oztemel's Apple

account. *See* Boxer Decl. ¶¶ 9-10.[10]  This "flagrant disregard" of the content restrictions of the

Warrants—as evidenced by failure to employ a reasonable search protocol to segregate

responsive data from nonresponsive data—also merits suppression.  *See, e.g.*, *Metter*, 860 F.

Supp. 2d at 216 (suppressing emails where the government failed to conduct relevancy review as

required by warrant); *United States v. Wey*, 256 F. Supp. 3d 355, 403-04 (S.D.N.Y. 2017)

(suppressing email evidence where government engaged in "overseizure" and a "conscious effort

was made to deem patently unresponsive materials responsive to the Warrants"); *see also Nejad*,

---

[10] Thus far, only 1,472 of the 64,458 documents seized pursuant to the Yahoo Warrant appear responsive. *See* Boxer Decl. ¶ 7.  The overwhelming amount of nonresponsive material separates this from cases where courts have not suppressed.  *See United States v. Dupree*, 781 F. Supp. 2d 115, 156–57 (E.D.N.Y. 2011) ("[E]ven if some of these documents were outside the scope of the warrant, they do not outnumber the documents described in the warrant."); *see also Nejad*, 436 F. Supp. 3d at 736 ("That some much smaller number of the 3,000 documents the Government seized may be irrelevant is not, on its own, sufficient to establish that the responsiveness review was unreasonable.").

436 F. Supp. 3d at 737 (suppressing documents that were not marked as responsive during government's responsiveness review but subsequently searched because they were outside the scope of the warrant).

## CONCLUSION

For all the reasons set forth above, the Court should dismiss the S1's charges against Glenn Oztemel, or, alternatively, order the government to provide a bill of particulars that identifies the bribe payments to foreign officials to which the charges in the S1 relate, and suppress the evidence seized pursuant to the Yahoo and Apple warrants.

Dated: New York, New York
      October 16, 2023

Respectfully Submitted,

Nelson A. Boxer
David Hoffman
Chanel Thomas
PETRILLO KLEIN & BOXER LLP
655 Third Avenue
New York, NY 10017
(212) 370-0338
nboxer@pkbllp.com

Paul McConnell
638 Prospect Avenue
Hartford, Connecticut 06105
(860) 266-1166
paul@mcconnellfamilylaw.com